FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | NO.  06 C 05629 |
| v. | ) | (98 CR 932-1) |
| | ) | |
| JOSEPH JEROME MIEDZIANOWSKI | ) | Hon. Blanche M. Manning |
| | ) | Judge |

GOVERNMENT'S RESPONSE
TO MOTION TO VACATE SENTENCE

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States

Attorney for the Northern District of Illinois, responds to Joseph Jerome Miedzianowski's

Motion under 28 U.S.C. § 2255 to Vacate Sentence, as follows:

I. SUMMARY INTRODUCTION

Miedzianowski contends that his trial counsel were ineffective for failing to mount a

vigorous defense and, in particular, failing to call certain witnesses and to present certain

evidence. Miedzianowski's motion should be denied because he has failed to establish either the

performance or the prejudice requirements of an ineffectiveness of counsel claim.

Miedzianowski attack on trial counsels' performance falls far short of establishing, as *Strickland*

requires that trial counsels' performance was constitutionally deficient - - beyond the realm of

reasonable professional judgment. Instead, based as it is upon Miedzianowski's mere

conclusions that witnesses not called and evidence not presented were "vital" or "necessary" to

his defense, it is a blatant attempt to have the Court engage in the prohibited second guessing of

trial counsels' strategic decisions.  Miedzianowski's attempt to establish prejudice is similarly

conclusory, with no attempt to establish how the results of the proceeding would have been

different. The Court is well aware of the mountain of evidence introduced against Miedzianowski, not the least of which were his own recorded conversations, and, ultimately his own testimony.  Miedzianowski motion is merit less  and  should be denied without a hearing.

II. <u>FACTUAL BACKGROUND</u>

Set forth below is a factual summary of the case organized by charge and evidence presented at trial.

A. <u>Overview of the Narcotics Conspiracy (Count Two)</u>

From 1994 through 1998, the drug conspiracy, led by Chicago Police Department (CPD) Gang Crimes Specialist Miedzianowski, Spanish Cobra street gang member Mohammed Omar, and Imperial Gangsters street gang leader Juan Martir, distributed hundreds of kilograms of cocaine, much in the form of "crack" cocaine, throughout the Chicago area.  Miedzianowski promoted and protected the narcotics organization through the use of his power, authority, training, and experience as CPD Gang Crimes Specialist.   Among other things, Miedzianowski resolved disputes among coconspirators, including disagreements over drug prices.  Miedzianowski ensured that members of the conspiracy avoided apprehension and prosecution.  He caused the return of narcotics to the organization by people who stole from the organization, and helped collect drug debts owed to members of the organization.   Miedzianowski provided guns and escort protection to members of the organization.  Miedzianowski also participated in ripoffs of narcotics (and money) from other drug dealers by members of the organization, and caused these drugs to be sold for profit by members of the organization.  Miedzianowski actively engaged in narcotics trafficking himself, brokering drug deals, purchasing narcotics, and supplying narcotics to customers and distributors.

B. Beginning of the Narcotics Conspiracy

In late 1994, Juan Martir began receiving cocaine on credit from Mohammed Omar.[1] The first time Martir arrived to pick up cocaine from Omar, Miedzianowski told Martir and Omar, "Be good to each other." Over approximately the next year, Martir purchased one to two kilos of powder cocaine on credit every five to seven days. During this time, Francisco Figueroa (who often accompanied Martir to pick up the cocaine from Omar) and others helped Martir cook the powder into crack, package and distribute it, and collect money.

Miedzianowski protected this drug trafficking operation. For example, in mid-1995, CPD officers arrested two of Martir's workers, who were in the process of cooking and repackaging a kilogram of crack at a stash house in Omar's building. Miedzianowski told Martir that Juan Miranda provided the information about the stash house to CPD. Miedzianowski arrived on the scene, talked with the officers with whom Miranda was cooperating, and pulled Miranda out of the police car, calling him a "dirty rat" for cooperating with CPD.

Martir later used other stash houses, including one on Montrose Avenue in Chicago, where Figueroa cooked and stored cocaine for Martir and Omar. In addition, in the summer of 1995, Martir and Yolanda Navarro moved into an apartment on Foster Avenue in Chicago, where they stored cocaine and money, and serviced customers. Lis also lived at the apartment, Figueroa cooked crack there, and Navarro, Lis, and Figueroa helped distribute powder and crack cocaine to Martir's customers, including Jesus Cuevas, Rolando Otero, and Rico Passley.

---

[1]Omar was also convicted of the RICO and narcotics conspiracy charges at trial. He proffered post-conviction admitted his guilt, provided physical evidence corroborating his proffer. His proffer and this evidence, a firearm, were admitted in aggravation at Miedzianowski's sentencing.

Miedzianowski was often present at the Foster apartment. For example, Samuel Castro saw Miedzianowski and his partner, CPD Gang Crimes Specialist John Galligan, eating at the Foster apartment in 1995; Figueroa once saw Miedzianowski at the apartment, wearing his gun and badge, while Martir bagging up cocaine; and Orlando Martir saw Miedzianowski at the apartment, his gun and badge lying on the sofa.

In November 1995, while Lis and Navarro remained at the Foster stash house, Martir and Cynthia Rodriguez moved into a house on Monticello in Chicago. Martir used the Monticello house in his narcotics business, keeping kilos of cocaine and money at that location. Martir told Rodriguez he was getting his cocaine from Omar, and on one occasion got a kilo from Miedzianowski.

In spring 1996, Omar began having supply problems. Martir decided to seek an alternate cocaine supply, and, in order to fund his new supply, decided to cheat Omar. Miedzianowski assisted in this scheme, providing Martir a fake search warrant to make it appear that the police had seized two kilos of cocaine from the Montrose stash house. Figueroa helped Martir, making the apartment appear as though a search warrant had been executed there, and providing the fake warrant to Omar. When Omar called Miedzianowski, Miedzianowski pretended that the search warrant was legitimate. Martir then sold the two kilos, started purchasing cocaine from other suppliers, and made payments to Omar over time for the debt incurred for these two kilos.

Miedzianowski continued to protect Martir and his drug associates during this time period. On one occasion, Martir and Figueroa, who had cocaine wrappers in their car, were stopped by the police. The police released Figueroa, and Martir told Figueroa to call

Miedzianowski. Shortly thereafter, Martir was released. Miedzianowski later told Martir that the police who let him go were "good friends of [Miedzianowski's]." Martir informed others of Miedzianowski's protection, telling Cuevas in 1996 that he had a "crooked cop" working for him. Martir then gave Cuevas Miedzianowski's phone number as a reward for being a valuable customer. Cuevas later called Miedzianowski for favors, such as getting his car back or when his friends were arrested.

A few months after their initial conversation about Miedzianowski, Martir told Cuevas that they needed to pay Miedzianowski for "having him on their side," and Cuevas agreed to pay Miedzianowski $2,500 per month. Martir typically added the $2,500 fee to Cuevas's tab, but on one occasion, Navarro picked up $2,500 from Cuevas to give to Miedzianowski.

In the spring of 1996, Fred Rock met with Omar and Martir. Martir told them that Miedzianowski wanted to be paid $12,000 for protecting the drug organization, and Omar told Rock that Miedzianowski had made over $250,000 with him.

C. Miami-Chicago Supply for the Narcotics Conspiracy

In the spring of 1996, Martir and Rodriguez moved to Miami, but continued to supply cocaine to Martir's customers in Chicago with Lis's and Navarro's assistance.

Martir employed several couriers to transport narcotics from Miami to Chicago, including Lis, Rivera, Nelson Padilla, Orlando Martir, Juan Miranda, David Miranda, Rolando Otero, and Cynthia Rodriguez, paying them approximately $1,000 to $1,500 per trip and strapping the drugs to their bodies. The couriers, including Figueroa, Rivera, Lis, Otero, Rodriguez, and Juan Miranda, also carried Martir's drug money back to Miami, typically $40,000 per trip. On one occasion, Navarro strapped money to Orlando Martir while

5

Miedzianowski was present. After checking to see whether the money was detectable on Orlando Martir's person, Miedzianowski and Lis drove him to the airport.

Padilla, who was Martir's first courier, and Rodriguez provided couriers with airline tickets and cash to buy tickets. Lis, Martir's second and most frequent courier, began transporting cocaine in late 1996. Lis transported cocaine up to twice a week; after approximately two to three months, Lis became concerned that the flight attendants had started to recognize her.

Lis also recruited Rivera to serve as a courier, who transported cocaine on two to three occasions beginning in 1996; the first time Rivera transported cocaine, Martir and Padilla strapped two kilos of cocaine to her body. Rodriguez also testified about strapping a kilogram of cocaine on Rivera's body and taking her to the Fort Lauderdale airport. Numerous airline tickets showed Chicago/Miami-area travel by Lis and Rivera.

Once couriers arrived in Chicago with the cocaine, Navarro and Lis picked them up at the airports in Chicago in a Quest minivan that contained a secret compartment to hide the drugs. Navarro used drug money to pay for a Pontiac with a secret compartment; Lis later took over the payments for the Pontiac, and used it to transport drugs.

### D. Mohamed Omar Supplies Feliciano

In winter 1996, Rock fronted Feliciano one-half kilo of crack and 50 pounds of marijuana that he and Omar obtained from Omar's Indiana source. Approximately one month later, Miedzianowski, in his unique role as a police officer and drug dealer who managed the conspiracy's relationships and business, informed Rock that Feliciano would not be repaying the debt.

E. <u>Martir Introduces Miedzianowski and DeLeon</u>

Shortly after Martir moved to Miami, Martir arranged for Joseph DeLeon and Miedzianowski to meet. Martir told DeLeon that Miedzianowski was a cop who could help him "stay out of trouble." Miedzianowski gave DeLeon his business card and told him to show the card if he ran into trouble. In summer 1996, after DeLeon was arrested for mob action and bonded out, he called Miedzianowski; the case was dismissed the same day. In fall 1996, DeLeon was arrested for attempted car theft. DeLeon paged Miedzianowski, and was released within the hour; the case was dismissed.

After Martir moved to Miami, sometime in 1996 or 1997, Miedzianowski told Martir that DeLeon was unhappy with Martir's prices. Miedzianowski attempted to mediate this dispute during a meeting in the parking lot of the 25th District Police Station, which Martir, DeLeon, Miedzianowski, Galligan, and Figueroa attended. Shortly after this meeting, Miedzianowski instructed DeLeon to pay his drug debt to Martir. DeLeon paid off his $22,000 drug debt to Martir, and Martir stopped supplying DeLeon with cocaine.

Approximately one week later, Miedzianowski contacted Martir and requested a kilo of cocaine on credit. Martir then began supplying Miedzianowski with one kilo of cocaine every 5-7 days, and Miedzianowski began supplying kilogram quantities of cocaine to DeLeon. DeLeon obtained the cocaine from Navarro and Lis.

F. <u>Lovejoy Stash House and Robbery</u>

In late 1996, Martir moved Navarro and Lis to an apartment on Lovejoy street in Chicago. Martir also had secret compartments built into that apartment, which he, Navarro, and Lis accessed. At some point in late 1996, Figueroa had stopped cooking crack for Martir, but

Miedzianowski, who was dating Lis, asked Figueroa to continue cooking for Lis and Navarro. Figueroa agreed and cooked approximately a kilogram of crack at the Lovejoy apartment every week, often while Miedzianowski was present.

Navarro, Lis, and Figueroa supplied customers such as DeLeon from the Lovejoy apartment, and Miedzianowski continued to protect the operation. For example, on one occasion police officers were near the apartment due to an accident, prompting Miedzianowski to walk DeLeon to his car, handing him a half-kilogram of cocaine, so DeLeon could avoid any problems with the police. On another occasion, Lis provided Fred Rock with an ounce of cocaine on credit. When Lis's call for payment went unanswered, Miedzianowski told Rock to pay the money or Miedzianowski would have Rock arrested. Rock paid Miedzianowski within 15-20 minutes.

In late spring 1997, while Chicago was experiencing a cocaine drought, Martir began sending approximately 6 kilos a week to Chicago. Approximately one month into the drought, while Martir was in Miami, the Lovejoy apartment was robbed. The robbers approached Lis outside the apartment at gunpoint, and then woke up Navarro and her boyfriend, Fred Rock, inside the apartment. The robbers took at least three kilograms of cocaine and some cash from a hidden compartment in the bathroom, which they forced Navarro to open.

After the robbers left, Navarro called Martir, who told her to call Miedzianowski. Lis and Martir both called Miedzianowski, who immediately came to the apartment. When Martir spoke to Miedzianowski, Miedzianowski told him that he would "get to the bottom of it." Navarro, Lis, Rock, and Miedzianowski determined that they had previously seen one of the robbers with Darrell Johnson and Rolando Otero, and Miedzianowski said he was "going to get

those sons of bitches." Miedzianowski then called Otero to demand the return of the cocaine. Miedzianowski told Rock that if Otero did not return the cocaine, Miedzianowski would have another officer plant drugs on Otero and lock him up.

Johnson and two other individuals had robbed the Lovejoy stash house, after previously discussing the robbery with Otero. As Johnson drove away after the robbery, Otero called him and told him Miedzianowski was mad about the robbery and how the robbers "manhandled" Lis. Otero also told Johnson to give back the cocaine, but Johnson initially refused. Later that day, Miedzianowski called Johnson and told him to return the drugs. Martir had previously told Johnson that Miedzianowski was on his payroll, and after observing officers driving around his neighborhood and learning that they were looking for him, Johnson decided to give the drugs back.

Johnson gave three kilograms of cocaine and $10,000 to Otero. Otero, in turn, contacted Martir, who sent Figueroa to pickup the cocaine. Miedzianowski followed Figueroa on this trip "to make sure everything was going to be okay."[2] Martir told Navarro that he gave Miedzianowski one of the recovered kilos in exchange for Miedzianowski recovering the drugs, and Miedzianowski later gave the kilo to Navarro and Lis to sell for their own profit. Miedzianowski arranged for Navarro and Lis to sell the kilo to DeLeon, and they used the proceeds to buy another kilo from Cuevas.

---

[2] Miedzianowski was convicted of possession with intent to distribute these three kilograms of cocaine in renumbered Count Four.

Following the robbery of the Lovejoy apartment, Navarro continued providing Miedzianowski with Martir's cocaine, but Martir's other customers were serviced by Henry Rodriguez.

In February 1998, CPD officers raided DeLeon's brother's house, and recovered a half kilogram of cocaine and two guns (including an antique gun Martir had given Miedzianowski) that Miedzianowski had, in turn, given DeLeon.[3]  DeLeon called Miedzianowski, who told DeLeon the identity of the informant who told on DeLeon's brother.  DeLeon then arranged for his brother to turn himself into Miedzianowski.  Miedzianowski subsequently turned DeLeon's brother over to one of the CPD officers working the case, but repeatedly told the brother, in the presence of other officers, not to say anything to that officer, an unprecedented occurrence for that veteran officer.

G.  Miedzianowski and Lis Distribute Cocaine

At the time Martir moved to Miami, Figueroa owed him $33,000.  Because Martir owed Omar $25,000, Martir and Omar arranged for Figueroa to pay his debt to Omar.  In mid-to-late-1997, Miedzianowski told Figueroa to tell Omar that he (Miedzianowski) was taking over the

---

[3]  In early 1996, Martir gave Miedzianowski an antique .45 caliber handgun later recovered at DeLeon's brother's house.  Other evidence revealed that Miedzianowski supplied additional firearms to his coconspirators.  For example, from 1995 through 1997, Miedzianowski gave Martir a .22 caliber target pistol, a .380, a .357 revolver, and a 9 mm handgun.  At Christmas 1997, Miedzianowski gave DeLeon a .40 caliber Smith and Wesson.  Over the next year, Miedzianowski gave DeLeon 8 to 11 guns and ammunition, which DeLeon gave to his fellow street gang members. Post-conviction Mohammed Omar proffered that he, too, had received a semi-automatic pistol from Miedzianowski at about the time he and Miedzianowski were ripping-off drug dealers together. Omar caused a third-party to turn that handgun, still in its original box, over to the FBI and federal firearms records confirmed that Miedzianowski was its original purchaser. Omar's proffer and the handgun were submitted to the court in aggravation of Miedzianowski's sentence.

debt, and that they were "all even."  Miedzianowski then told Figueroa that he wanted him to begin cooking crack for Miedzianowski at his and Lis's new apartment on Bryn Mawr, in Chicago.

Figueroa first cooked a kilo of cocaine into crack at the Bryn Mawr apartment that same day, continuing to do so every week.  Miedzianowski assured Figueroa that nothing would happen to him while he was cooking for Miedzianowski.  Lis measured out the quantities of cocaine, occasionally saving some powder from the kilo for other customers.  Figueroa also attempted to teach Lis to cook cocaine at the Bryn Mawr apartment, having previously attempted to teach her at the Kentucky apartment.  Miedzianowski told Figueroa that Lis "messed up" the cooking, and that he needed Figueroa to do it.  On the 25 occasions that Figueroa cooked kilograms of cocaine at Bryn Mawr, Lis was present every time, and Miedzianowski approximately 20 times.  Figueroa last cooked crack for Miedzianowski and Lis in the summer of 1998.

Figueroa also cooked cocaine for Miedzianowski and Lis at his own house on Newcastle on approximately three occasions.  On one occasion in 1997, Figueroa misplaced his pager after cooking the crack.  Miedzianowski then came to his house, assaulting him and yelling at him for not responding to Miedzianowski's pages.  Miedzianowski told Figueroa that three big men outside Figueroa's house would break his legs, tear his house apart, and take him to jail. Miedzianowski later told Figueroa that he had initially mistakenly gone to Figueroa's neighbor's house and scared the elderly lady who lived there.  This neighbor testified about the frightening incident at trial.

During this time period, Navarro delivered kilo quantities of cocaine from Martir to Miedzianowski, leaving them with Lis or at a stash house on Catalpa in Chicago. Miedzianowski gave Navarro keys to access the Catalpa basement, and a business card with a note for the resident, his cousin, in case Navarro had any problems. Cuevas also provided Miedzianowski with kilos of powder cocaine by brokering transactions. On one or two occasions, Lis came with Miedzianowski to pick up the cocaine. On these occasions, when Cuevas handed the kilos of cocaine to Miedzianowski, Miedzianowski was wearing a firearm.

DeLeon picked up half-kilo quantities of crack from Miedzianowski and Lis at the Bryn Mawr apartment every 7-10 days. In fall 1997, when DeLeon mentioned that it was difficult to get a hold of Lis to pick up the cocaine, Miedzianowski began delivering the cocaine to DeLeon around Chicago.

H.  Martir's Arrest in Florida

In February 1998, Martir was arrested in Miami on narcotics charges. At that time, Miedzianowski owed Martir $22,000 for a kilo of cocaine delivered by Navarro, and Feliciano owed Martir $80,000 for drugs. After Martir's arrest, DeLeon and Miedzianowski discussed the decreased supply of cocaine. In summer 1998, Miedzianowski arranged for Omar to supply DeLeon with cocaine on three or four occasions, and DeLeon and Omar paid Miedzianowski $250 for brokering the transaction. DeLeon stopped purchasing cocaine from Omar because Omar sold him bad cocaine that wouldn't cook into crack. When DeLeon complained to Miedzianowski, Miedzianowski told him that he did not have to pay Omar the money he owed him for the bad cocaine. DeLeon then gave half the money he owed Omar to Miedzianowski.

In 1998, during a trip to Mexico with their families, Miedzianowski told Cuevas that he was selling DeLeon kilos of crack every other week, and asked Cuevas to take over the responsibility. [4] Cuevas then began supplying DeLeon with crack and marijuana.

Also after Martir was arrested in February 1998, Miedzianowski and DeLeon approached Passley and asked him to sell narcotics for them. The plan was for Miedzianowski to supply DeLeon, who would then supply Passley. DeLeon then began supplying Passley with crack. On one occasion in 1998, after Passley had asked for a "blessing," referring to narcotics, and Miedzianowski told Passley he would "bring it," Miedzianowski directed Passley to meet him at a police station. After Passley arrived at the police station and asked for Miedzianowski, Miedzianowski's partner, John Galligan, passed Passley a file containing three ten-packs of crack cocaine.[5] Passley later complained to Miedzianowski about the poor quality of the crack he received from Galligan, telling Miedzianowski in a wiretapped conversation "that little demo" that "old boy" gave him was "f_____ up."

I. Conversations Regarding Martir's Arrest and Cooperation

After Martir was arrested, Miedzianowski and Martir discussed over a recorded prison telephone whether Martir was going to cooperate against people in Chicago. In one call, for

---

[4] The jury saw a video of Miedzianowski and his son deep sea fishing with Cuevas and his associates during this vacation.

[5] Miedzianowski was convicted of distributing this crack cocaine in renumbered Count Six. Galligan pleaded guilty to this offense and charges related to Miedzianowski's extortion of a kilogram of cocaine during the execution of a search warrant in a separate information. Galligan and Miedzianowski were charged with offenses related to this kilogram of cocaine in old Counts Three, Four and Five.

example, Martir assured Miedzianowski, "Ain't nobody going down," meaning that he was not going to cooperate against Miedzianowski and their narcotics associates in Chicago.

Miedzianowski was also intercepted during the wiretap discussing Martir's cooperation with authorities in Florida and past activities of the drug organization. For example, in one conversation, Miedzianowski and Navarro discussed who Martir (nicknamed "Casper") was "tricking on." During that call, the two discussed prior activities of the drug organization, talking about the "charity work" that Navarro and Lis (nicknamed "Ala"), "were doing with that P Guy" for "a long time," which Navarro indicated was Miedzianowski talking about the time period that she and Lis supplied kilos of cocaine to DeLeon (nicknamed "Pote"). In that same conversation, they talked about the Lovejoy robbery, with Miedzianowski referencing the "last people that stuck your ass up" and telling Navarro that he would "f___ them from here to eternity." In a later conversation, Miedzianowski and Navarro talked about certain people being lucky that Miedzianowski knew people involved in Martir's attempts to cooperate given their prior involvement in Martir's drug activities, especially Lis (nicknamed "Alzilla"), who took "trips," which Navarro explained was a reference to picking up drugs in Florida.

J. Miedzianowski and Cuevas Ripoff of One Kilogram of Cocaine

Cuevas and Miedzianowski conducted a "geezo," or ripoff, of one kilogram of cocaine from one of Cuevas's cocaine suppliers by making it appear to the supplier that one of Cuevas's workers was arrested by the police, who seized the cocaine, but in actuality, Miedzianowski conducted a fake arrest while letting Cuevas (and Cuevas's worker) keep the cocaine.[6]

_____

[6] Miedzianowski was convicted of possession with intent to distribute this kilogram of cocaine in renumbered Count Eight.

14

Miedzianowski's and Cuevas's planning of this ripoff in fall 1998 was captured over the wiretap. Miedzianowski told Cuevas that he was ready to do the ripoff because he had an unmarked police car, but that it would look "odd" with only "one guy," referring to one cop, out there conducting the fake arrest. In response, Cuevas assured Miedzianowski that Cuevas did not care, as long as Cuevas's drug supplier saw "the car," referring to the unmarked police car.

On the day of the ripoff, Miedzianowski pretended to arrest Cuevas's brother-in-law Nestor, after which Cuevas told his drug source, who had previously provided Cuevas with a kilogram of cocaine, to walk by Cuevas's house to see that Nestor had just been arrested with the cocaine. In fact, Cuevas had the kilogram of cocaine with him, which Cuevas later sold, providing Miedzianowski with $3,000 of the proceeds. Cuevas then met with his drug source's supplier to explain that the police had taken the kilo of cocaine. Cuevas agreed to give the supplier a car to pay for the kilo, but the supplier agreed to return the car if Cuevas could produce paperwork from the arrest and seizure of the kilo of cocaine. Cuevas then told Miedzianowski that once the supplier saw "the papers," Cuevas "could have [his] car back." In response, Miedzianowski told Cuevas, "I'm gonna get you that paperwork," and he confirmed with Cuevas that Cuevas had received "one car," meaning one kilogram of cocaine, from drug supplier, so that he could put the correct information on the paperwork. Cuevas later asked Miedzianowski to put down on the arrest paperwork that it cost $10,000 to bond out Cuevas's friend, to make the arrest and paperwork appear legitimate.[7]

---

[7] At the time Miedzianowski was arrested, agents recovered a book of bond slips missing 49 slips out of 50; none of the missing bond slips had ever been entered into the system. Miedzianowski gave and sold bond slips to his coconspirators to make it appear as though they were arrested, so they would not have to pay for drugs.

K. <u>Miedzianowski's Awareness of Federal Investigation</u>

In mid-December 1998, an employee of AT&T security inadvertently tipped off Miedzianowski that there was a pen register on DeLeon's telephone, which call was intercepted on the wiretap. Miedzianowski then told DeLeon that the "feds" were watching him and tracing the numbers on his telephone. Miedzianowski also warned Cuevas that DeLeon's telephone was tapped. Miedzianowski told Rock that his phone was tapped.

L. <u>Miedzianowski's RICO Conspiracy (Count One)</u>[8]

In late 1988, Hector Hernandez purchased kilograms of cocaine from Omar at below-market rate. Omar told Hernandez he could sell them cheap because he got them from a robbery. Shortly thereafter, Hernandez spoke with Columbian Nelson, who told him that the police confiscated ten kilos of cocaine from Nelson's workers that were destined for Omar. Hernandez then realized that the kilos he had obtained from Omar were the ones taken from Nelson's workers, and told this to Nelson. Omar later told Hernandez that he did his robberies with Miedzianowski. Hernandez also provided Miedzianowski with information about drug transactions and locations, and after Miedzianowski conducted police stops, he gave Hernandez drugs.

In 1993 or 1994, Miedzianowski, Rock, and Hernandez decided to rob a drug dealer named "Pisco." Hernandez set up a drug deal with Pisco, and Miedzianowski pulled Pisco's car over on the way to the deal. Hernandez and Rock later met Miedzianowski at a garage, and they

---

[8]Because the narcotics conspiracy charged in Count Two was a predicate activity of the RICO conspiracy charged in Count One, Miedzianowski's activities on behalf of the 1994-1998 narcotics conspiracy were also in furtherance of the 1985-1998 RICO conspiracy.

found four kilos of cocaine secreted in the car. Rock and Hernandez then sold the cocaine and gave money to Miedzianowski. Miedzianowski later gave Hernandez a new 9mm handgun after the robbery when Hernandez was concerned for his safety. Miedzianowski, Rock, and Hernandez set up another similar robbery for a half kilo of cocaine approximately two months later. Miedzianowski had his gun and badge during the robbery.

Sometime in 1995, Omar and Padilla told Martir about a "stick up" they did with Miedzianowski. Omar set up a multi-kilo cocaine deal with some individuals for $250,000. When the individuals arrived for the deal, Omar told them he did not have the cocaine. As the individuals were leaving, Miedzianowski pulled them over and took the money.[9]

M.  Miedzianowski's Conspiracy to Commit Extortion Under Color of Official Right (renumbered Count Three)

Rolando Otero and Miedzianowski accepted money from drug dealers by indicating that Miedzianowski could affect the outcome of their state-court criminal cases. Among other victims of this scheme, Cristobal Lozada paid Otero $20,000, $15,000 of which Otero passed onto Miedzianowski, for Miedzianowski's assistance in disposing of Lozada's pending state case for possession of multiple kilograms of cocaine. After paying the money, Miedzianowski gave Otero questions to pass along to Lozada. Lozada told attorney Ralph Meczyk he had been approached by someone who said they could fix Lozada's case in exchange for $20,000. Meczyk told Lozada that the people wanting the money were just going to ripoff Lozada and that he (Meczyk) did not want any part of such activity.

---

[9] Nelson Padilla's plea agreement and the proffers of Padilla and Omar provided additional evidence of these and other rip-offs of drug dealers committed by Miedzianowski and his associates and were relied upon in aggravation of Miedzianowski's sentence.

Otero and Miedzianowski also obtained $20,000 from Rito Garcia in exchange for Miedzianowski's assistance in affecting the outcome of Garcia's state case. Otero indicated that he received money from his middleman brother and passed it to Miedzianowski. In return, Miedzianowski was to give Otero questions for Otero to give to Garcia's lawyer to ask of the arresting officers. Garcia's lawyer on the state case, Ralph Meczyk, received a list of questions from Otero's brother for Meczyk to ask during a pretrial motion or at trial. Meczyk indicated that he threw the questions in the garbage.

During the post-arrest search of Miedzianowski's house and police car, officers recovered including a copy of the police reports in Lozada's and Garcia's cases, as well as a copy of a list of questions directed to the two officers who arrested Garcia.

### N. Miedzianowski's Wire Fraud (renumbered Count Seven)

In 1995, Nelson Padilla, a street gang member and former customer of Martir, asked Martir for a place to hide from police officers who wanted Padilla for the murder of Robert Detres. (Padilla was arrested for this murder in April 1998 in Miami and prosecuted.) Martir contacted Miedzianowski concerning Padilla's request for help to hide from the police; Miedzianowski told Martir that Padilla was "a good guy to have around." Miedzianowski helped Nelson Padilla avoid arrest on this murder charge for approximately three years.[10] In fall 1998, Miedzianowski committed wire fraud by running a criminal history check on Nelson

_____

[10]Padilla subsequently pleaded guilty to this murder. Wiretap conversations also captured Miedzianowski advising another murder suspect, who was also subsequently convicted, on how to concoct and alibi.

18

Padilla, at a time when Padilla was wanted for murder, to see if Padilla was wanted on any warrants. [11]

O. Miedzianowski's Illegal Possession of Weapons (Renumbered Counts Five, Nine, and Ten)

The government also presented evidence in support of several weapons charges, including renumbered Count Five, charging Miedzianowski with carrying a firearm in relation to a drug trafficking crime. Miedzianowski regularly wore his firearm during narcotics transactions, in the presence of other coconspirators. Miedzianowski's own statements intercepted on the wiretap further indicated that Miedzianowski wore his gun; for example, on one occasion Miedzianowski told Rock that if anybody came after Miedzianowski, they better be "gapped up to the max."

With respect to renumbered Counts Nine and Ten, agents conducting the search of Miedzianowski's house testified about the recovery of a short-barreled rifle, and ammunition that turned out to be stolen.

III. PROCEDURAL HISTORY

A. Indictment

Miedzianowski and others were charged with conspiracy to distribute and to possess with intent to distribute more than 5 kilograms of cocaine, more than 50 grams of cocaine base, and unspecified quantities of heroin and marijuana, in violation of 21 U.S.C. §846 (Count Two). In addition, the indictment charged Miedzianowski and others with RICO conspiracy, in violation

---

[11] Miedzianowski had previously used his police powers to help Padilla by testifying falsely on Padilla's behalf at a state court sentencing hearing resulting in a substantial sentence reduction for Padilla.

of 18 U.S.C. §1962(d) (Count One); conspiracy to commit extortion, in violation of 18 U.S.C. §1951 (Counts Three and Seven); extortion (Count Four); possessing cocaine with intent to distribute, in violation of 21 U.S.C. §841(a)(1) (Counts Five and Twelve); using and carrying a firearm during and in relation to a crime of violence or a drug trafficking crime, in violation of 18 U.S.C. §924(c) (Counts Six and Nine); distributing cocaine and cocaine base, in violation of 21 U.S.C. §841(a)(1) (Counts Eight and Ten); wire fraud, in violation of 18 U.S.C. §1343 (Count Eleven); possessing stolen ammunition, in violation of 18 U.S.C. §922(j) (Count Thirteen); and illegally possessing a short-barreled rifle, in violation of 26 U.S.C. §5861(d) (Count Fourteen).

B. Trial

Five defendants, including Miedzianowski, Lis and Feliciano, proceeded to trial. During the three month trial, the government presented the testimony of numerous witnesses, including fourteen cooperating defendants,[12] and published more than 250 telephone conversations intercepted pursuant to a Title III wiretap on two of Miedzianowski's home telephones, as well as consensually-recorded calls between Miedzianowski and coconspirator Juan Martir originated from the Federal Detention Center in Miami, Florida. As the Court is aware, the evidence against all defendants was overwhelming.

C. The Defense

At trial, Miedzianowski was represented by two very experienced criminal defense attorneys. Miedzianowski, Lis and Mohammed Omar testified at trial. Their respective testimony

---

[12]  These individuals, who pled guilty to the narcotics conspiracy or related charges, included: Samuel Castro ("Puite"), Jesus Cuevas ("Flip"), Jose DeLeon ("Pote"), Francisco Figueroa ("Frankie"), Darrell Johnson, Juan Martir ("Casper"), Orlando Martir ("Londy"), Juan Miranda ("Spooky"), Yolanda Navarro ("Joli"), Rolando Otero ("Biggie"), Rico Passley, Fred Rock, and Cynthia Rodriguez.

was consistent with each other, but incredible. Mohammad Omar later admitted as much in his post-conviction proffer. Consistent with the defense trial counsel attempted to establish on cross-examination, through his testimony Miedzianowski contended that he was really engaged in legitimate police work and that his codefendants were really his informants, witting and unwitting, or the targets of his investigation.

D. The Verdict

The jury convicted Miedzianowski of all counts on which it deliberated.[13] In rendering its verdict on the drug conspiracy charge, the jury further determined that the government had proven, beyond a reasonable doubt, that the conspiracy involved 5 or more kilograms of cocaine, and 50 or more grams of cocaine base. As this Court noted in affirming his conviction, the evidence supported the conclusion that the conspiracy distributed more than 300 kilograms of cocaine. 136 Fed. Appx. 925 (7th Cir. 2005).

Miedzianowski's adjusted offense level of 46, was 3 levels over the level at which a life sentence was mandated under the guidelines. Accordingly, the court sentenced Miedzianowski to serve a term of life imprisonment on Counts One and Two, as well as terms of imprisonment of five years each on Counts Three, Four, Six, Seven, Eight, Nine, and Ten, to be served

---

[13] After 13 weeks of evidence the government decided to drop certain counts against Miedzianowski based upon its conclusion that the evidence against him which had been presented to the jury was overwhelming and that presenting evidence on these additional counts would needlessly prolong the trial and not meaningfully increase his possible sentence. At the close of the government's evidence, the government moved to dismiss Counts Three, Four, Five, and Six as to defendant Miedzianowski, and the district court granted the government's motion. Before the case was submitted to the jury for deliberation, the counts in the indictment and verdict form were renumbered to account for the dismissal of these four counts, and Counts Seven through Fourteen were renumbered as Counts Three through Ten, respectively.

concurrently, and a term of imprisonment of five years on Count Five to be served consecutive to the life sentence imposed on Count Two.

E. Appeal

The Court of Appeal ordered limited remand, under *Paladino*, so that this court could reconsider Miedzianowski's sentence. This court issued an order regarding its reconsideration of its original sentence in light of *Paladino*. The district court noted that, "believes, as it did at the time of the original sentencing, that the sentence imposed is reasonable and is necessary to protect the public and reflect the seriousness of Miedzianowski's offenses.

> In justifying the sentence, the district court relied upon:

> Miedzianowski's grievous abuse of his police badge, the invidious nature of Miedzianowski's criminal activities, the length of time over which they occurred, the breadth of the effect they have had on other people's lives and the amount of drugs involved, . . . " *Id.*

On February 23, 2006, the Court of Appeals affirmed the judgement as to Miedzianowski. This Section 2255 petition was then timely filed.

IV. STANDARDS GOVERNING RELIEF PURSUANT TO SECTION 2255

Relief under Section 2255 "is reserved for extraordinary situations." *Prewitt v. U.S.*, 83 F.3d 812, 816 (7th Cir. 1996). Therefore, a criminal defendant may attack the validity of his sentence under Section 2255 only if:

> the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack.

28 U.S.C. § 2255 (1999); *Arango-Alvarez v. U.S.*, 134 F.3d 888, 890 (7th Cir. 1998).

A. Procedural Barriers

As set forth in greater detail below, a habeas petitioner may *not* raise (1) issues that were raised on direct appeal, absent a showing of changed circumstances, (2) nonconstitutional issues that could have been raised on direct appeal but were not, and (3) constitutional issues that were not raised on direct appeal unless petitioner demonstrates cause for the procedural default as well as actual prejudice from the failure to appeal, or demonstrates that the court's refusal to hear the constitutional claim would result in a fundamental miscarriage of justice. *Massaro v. United States*, 538 U.S. 500, 504 (2003).

"A § 2255 motion is neither a recapitulation of nor a substitute for a direct appeal." *Olmstead v. U.S.*, 55 F.3d 316, 319 (7th Cir. 1995); *see also, Bousley v. U.S.*, 523 U.S. 614, –, 118 S. Ct. 1604 (1998)(holding that a section 2255 motion will not do service for a direct appeal). This means that, absent changed circumstances, the court will not reconsider which was already decided on direct appeal, *Olmstead*, 55 F.3d at 319. *See Daniels v. United States*, 26 F.3d 706, 711-712 (7th Cir. 1994); Belford, 975 F.2d at 313; *Williams v. United States*, 2002 WL 226861 at *3 (N.D. Ill.). Neither may a defendant revive a litigated claim by re-characterizing it as ineffective assistance of counsel. *See Daniels*, 26 F.3d at 711-12.

Moreover,

> [a]n issue not raised on direct appeal is barred from collateral review absent a showing of both good cause for the failure to raise the claims on direct appeal and actual prejudice form the failure to raise those claims, or if a refusal to consider the issue would lead to a fundamental miscarriage of justice.

*Prewitt*, 83. F.3d at 816; *Kelly v. U.S.*, 29 F.3d 1107, 1112 (7th Cir. 1994). Consequently, a district court may not reach the merits of an appealable issue in a Section 2255 proceeding unless the issue has been raised in a procedurally appropriate manner. See,

*Theodorou v. U.S.*, 887 F.2d 1336, 1339 (7th Cir. 1989); *Johnson v. U.S.*, 838 F.2d 201, 202 (7th Cir. 1988)(emphasizing that a section 2255 petition "will not be allowed to do service for an appeal"). Failure to establish good cause or prejudice requires dismissal of the habeas petition. *See, e.g., Benlow v. Dickey*, 847 F.2d 420, 425 (7th Cir. 1988).

To show cause, Miedzianowski must demonstrate that an external objective factor impeded his ability to appeal. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). In other words, a "showing that the factual or legal basis for a claim was not reasonably available to counsel, or that 'some interference by officials,' made compliance impracticable, would constitute cause under this standard." Id. (citations omitted). However, with respect to a claim of ineffective assistance, when a defendant has the same counsel at trial and on appeal, that circumstance generally constitutes good cause for defendant's failure to raise a claim of ineffective assistance on direct appeal. *Barker v. United States,* 7 F.3d 629, 632 (7th Cir. 1993).

The "miscarriage of justice" exception to cause and prejudice is more narrow: "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray*, 477 U.S. at 496. Moreover, this exception is reserved solely for those with a claim of actual innocence. *See*, *Boyer v. U.S.*, 55 F.3d 296, 298 (7th Cir. 1995)(holding that petitioner's claim must be one of factual innocence, not legal innocence).

B. Ineffective Assistance of Counsel

Surprisingly, Miedzianowski fails to cite to any of the law governing his ineffectiveness of counsel claim.

Under *Strickland v. Washington*, 466 U.S. 668 (1984), the test for ineffective assistance of counsel is "'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial [or the appeal] cannot be relied upon as having produced a just result.'" *Mason v. Hanks*, 97 F.3d 887, 892 (7th Cir. 1996) (quoting *Strickland*, 466 U.S. at 686). There is a "strong presumption that the petitioner's counsel was constitutionally effective," *Mason*, 97 F.3d at 892, and Moore bears the "heavy burden" of overcoming this presumption. *Menzer v. United States*, 200 F.3d 1000, 1003 (7th Cir. 1999).

In order to meet the *Strickland* test, a petitioner must demonstrate that (1) counsel's actions were "beyond the realm of reasonable professional judgment within the context of the case, at the time that counsel acted" (the "performance prong"), and (2) counsel's "ineffectiveness prejudiced him, rendering the proceeding fundamentally unfair and the result unreliable" (the "prejudice prong"). *Mason*, 97 F.3d at 893.

### 1. Performance Prong

To satisfy the "performance prong," Miedzianowski must show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In determining whether Miedzianowski has established deficient "performance" under *Strickland*, the question is whether his counsel's decision "under all the circumstances of this case, . . . [was] made outside the wide range of professionally competent assistance." *Menzer*, 200 F.3d at 1003. Reasonable strategic decisions fall within this range. *Id.* at 1004.

As both the Supreme Court and the Seventh Circuit have repeatedly held, it is not the court's role to "grade counsel's performance" or to "take up the role of Monday morning

quarterback." *Strickland*, 466 U.S. at 697; *Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990). Trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[T]he Constitution calls for a professionally competent defense, not for the best possible defense." *Holman v. Gilmore*, 126 F.3d 876, 883 (7th Cir.1997). Defense counsel "need not pursue every conceivable avenue; they are entitled to be selective." *United States v. Davenport*, 986 F.2d 1047, 1049 (7th Cir. 1993); *Brown v. Sternes,* 304 F.3d 677, 692 (7th Cir. 2002)(it can be a reasonable exercise of judgment to terminate further investigation of a fruitless issue). Every indulgence is given "to the possibility that a seeming lapse or error by defense counsel was in fact a tactical move, flawed only in hindsight." *United States v. Taglia*, 922 F.2d 413, 417-418 (7th Cir. 1991).

In reviewing the adequacy of defense counsel's performance, this Court "must be 'highly deferential' and 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Canaan v. McBride*, 395 F.3d 376, 384 (7th Cir. 2005) (quoting *Strickland*, 466 U.S. at 689 (internal quotation marks omitted)). In other words, the court "presumes that counsel exercised reasonable professional judgment in making all significant decisions and otherwise rendered adequate assistance." *United States v. Moutry*, 46 F.3d 598, 604-05 (7th Cir. 1995). The court will not second-guess trial tactics that are rationally based. *United States v. Zarnes*, 33 F.3d 1454, 1473 (7th Cir.1994). See also *United States v. Ashimi*, 932 F.2d 643, 648 (7th Cir.1991) ("It is not our task to call the plays as we think they should have been called. On the contrary, we

must seek to evaluate the conduct from counsel's perspective at the time, and must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance.").

### 2. Prejudice Prong

If the record supports a finding of substandard performance, the Court must then determine whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *United States v. Starnes,* 14 F.3d 1207, 1209-10 (7th Cir. 1994). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In considering the prejudice prong, the Court must apply not simply an outcome determinative test, but also must assess whether the deficient performance deprived the defendant of a fair trial. *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). Thus, with regard to the prejudice prong, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693.

### C. Undeveloped Arguments

Claims of error which are undeveloped and unsupported by pertinent legal authority are considered forfeited or waived. The Seventh Circuit "has repeatedly warned litigants that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)." *United States v. Wimberly*, 60 F.3d 281, 287 (7th Cir. 1995) (*citing United States v. Berkowitz*, 927 F.2d 1376, 1385 (7th Cir. 1991); *see also United States v. Watson*, 189 F.3d 496, 500 (7th Cir. 1999); *United States v. Smallwood*,188 F.3d 905, 914 (7th Cir. 1999), *United States v. Brocksmith*, 991

F.2d 1363, 1366 (7th Cir. 1993). Any government response to these undeveloped and unsupported arguments should not be interpreted as a waiver of the argument that they are waived.

D. Necessity for a Hearing

Miedzianowski is not automatically entitled to a hearing. *See Cooper v. United States*, 378 F.3d 638, 641-42 (7th Cir. 2004) ("Even where factual improprieties are alleged, an evidentiary hearing is not warranted for every 2255 petition[,] [as] the district court has discretion to deny an evidentiary hearing where the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief."); *United States v. Gallo-Vasquez*, 402 F.3d 793, 797 (7th Cir. 2005) (a district court is entitled to consider "all the circumstances in the record in determining whether a hearing should be afforded.") (quotation omitted). With respect to allegations of ineffective assistance, it is the rule of the Seventh Circuit that in order for an evidentiary hearing to be granted, the petition must be accompanied by a detailed and specific affidavit which shows that the petitioner had actual proof of the allegations going beyond mere unsupported assertions. *Prewitt,* 83 F.3d at 819. This analysis takes place in the context of the presumption that an attorney's conduct is reasonably proficient. *Galbraith,* 313 F.3d at 1008.

V. ANALYSIS

Miedzianowski cannot show that his trial counsels' performance was constitutionally deficient or that the result of defendant's trial would have been different were it not for his attorney's alleged errors. Defendant alleges several specific instances of ineffective assistance of counsel, and these are addressed seriatim:

A.  Miedzianowski contends that trial counsel effectively abandoned his defense, relying for this claim on a note (Defendant's Exhibit A) he claims to have received from trial counsel during the trial.[14] This is nothing more than trial counsel's expression to his client that the defense strategy that Miedzianowski had trial counsel pursue was not working and needed to be re-evaluated. This note is understandable as there were few instances when trial counsel' cross-examination, however artful, benefitted Miedzianowski and more than a few in which the result was only more incriminating evidence.  The reevaluation of trial strategy is the prerogative of trial counsel and absolutely no basis for an ineffectiveness claim.

B.  Miedzianowski argues that his trial attorneys were constitutionally deficient by failing to call witnesses listed on Defendant's Exhibit B. Miedzianowski has failed to proffer any evidence regarding how these witnesses would have testified if subpoenaed for trial. He has simply, without more, characterized their testimony as "necessary" or "vital" to his defense. Defendant's claim of ineffective assistance with respect to these witnesses is therefore insufficient and should be dismissed outright. *United States v. Anderson*, 61 F.3d 1290, 1298-99 (7th Cir. 1995) (rejecting ineffective assistance claim based on defense counsel's failure to call witnesses because the defendant did not show on the record what those witnesses would have said); *United States v. Muelbauer*, 892 F.2d 664, 669 (7th Cir. 1990) (same); *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) (indicating that self-serving speculation concerning putative witness's testimony will not sustain ineffective assistance claim). Although not made part of this claim, defendant has submitted what could pass as a proffer of the testimony of witness listed on Defendant's Exhibit D. Yet, he has not made any showing explaining why

_____

[14] To the extent it is relevant, the government believes that the note says "rest" and not "rust."

29

defense counsel was constitutionally deficient by not calling or re-calling these witnesses. Defense counsel could have determined that, as a matter of trial strategy, these witnesses could hurt the defendant's case more than help it. This was a great risk in the case of witnesses whose testimony on behalf of the government was totally corroborated by incriminating Title III recorded conversations with Miedzianowski, as was the case with most every witness. Without more explanation, defendant cannot satisfy *Strickland*'s first prong, that his trial counsel acted unreasonably. In short, the defendant has not provided any evidence from the record showing that his attorney failed to pursue a legitimate trial strategy by declining to call these witnesses, or that, in light of the overwhelming evidence against him, he suffered any prejudice from their failure to testify. Simply put, these witnesses could have testified to everything set forth in Miedzianowski's motion on page 3 in paragraph b and it would not have had any effect on the outcome. This is because Miedzianowski could have been engaged in some legitimate police work (and probably was) at the same time he was committing the charged offense. Neither does Miedzianowski explain how anything these witnesses could have said would have negated the incriminating recorded conversations.

C. Miedzianowski next attacks trial counsels' failure to recover "street files." Miedzianowski fails to explain what was in the street files, simply characterizing them as "vital" and speculating that they "could prove his innocence." This perfunctory and undeveloped argument, unsupported by pertinent authority argument, should be deemed forfeited or waived. *Wimberly*, 60 F.3d at 287; *see also Watson*, 189 F.3d at 500; *Smallwood*, 188 F.3d at 914;

*Brocksmith*, 991 F.2d at 1366.[15] Regardless, defendant has offered no evidence to establish a deficiency in representation for purposes of the first *Strickland* prong. Nor has the defendant submitted any evidence explaining why these allegedly missing files were favorable to his defense, so defendant has failed to demonstrate any prejudice consistent with the second *Strickland* prong. Accordingly, this claim should be rejected.

D. Miedzianowski contends that trial counsel were deficient for failing to review tapes and failing to play tapes listed on Defendant's Exhibit C at trial. As to the first argument, Miedzianowski fails to corroborate his claim that trial counsels failed to prepare by citing even a single incident at trial were his trial counsels were unprepared. As to the second argument, Miedzianowski again fails to explain how any of these tapes would have helped his defense, why it was not a reasonable trial strategy not to play these tapes, or how the outcome would have been different had any or all of the tapes been played. This claim is merit less and waived.

E. Miedzianowski contend that trial counsel were ineffective for failing to recall certain prosecution witnesses. He fails to even identify these witnesses, much less inform the Court of their testimony. This claim, too, is merit less and waived.

F. Miedzianowski asserts that trial counsel were ineffective for allowing the government to view defense exhibits 57, 58 and 59, which he fails to describe other than as confidential. The undersigned lead government attorney has no recollection of these exhibits, but will assume for sake of this response that they were viewed by the government. Without more it is difficult for the government to even address this argument. Clearly, if trial counsel were to have sought to

---

[15] Any government response to these undeveloped and unsupported arguments should not be interpreted as a waiver of the argument that they are waived.

introduce these exhibits, they would have to have allowed the government to view them. Thus showing them to the government would not have been deficient performance. In any event, Miedzianowski fails to explain how the result would have differed had the government not seen these exhibits. This is another merit less and waived argument.

G. Miedzianowski contends that trial counsel generally ignored his instructions. Without more, again, it is difficult to address this undeveloped argument other than that it is merit less and waived. However, given the futility of the defense Miedzianowski persisted in advancing in his own testimony, it was likely a reasonable trial strategy for trial counsel to decline to follow his instructions.

H. and I. Miedzianowski contends that trial counsel was deficient in failing to call unidentified IRS agents to testify and to make a *Brady* motion for an IRS investigation which Miedzianowski, on information and belief, asserts would have failed to discover unexplained assets which could have been the proceeds of the charged offenses. This is simply a red hearing, as none of the charged offenses had as their element any requirement that the government prove up proceeds. For this reason, Miedzianowski cannot show that the outcome would have been different had this purported evidence been presented.

J. Finally, Miedzianowski contends that trial counsel was deficient in failing to obtain evidence which would have been used to impeach, Nelson Padilla, a potential government witness, and attack his "deal" with the government. This evidence, a letter, was actually in the possession of codefendant Mohammed Omar, and to the government's understanding available to all defendants before the government learned of its existence. The problem with Miedzianowski's final claim is that Padilla never testified. Thus, there was never any need to

impeach him, and the failure to obtain impeachment materials could not have been constitutionally deficient performance or resulted in prejudice.

VI. CONCLUSION

Miedzianowski received effective assistance of counsel. Defense counsel filed extensive pre-trial motions, and zealously cross-examined the government's witnesses at trial. Moreover, given the overwhelming evidence of defendant's guilt, including wiretap evidence and the testimony of virtually every one of his coconspirators, defendant cannot show that the result of his trial would have been any different with a different attorney. Therefore, defendant's claim of ineffective assistance of counsel must be denied.

WHEREFORE, the United States asks this Court to deny Miedzianowski's § 2255 Motion without a hearing.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

December 14, 2006

By:_____
BRIAN PATRICK NETOLS
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-4128

## <u>CERTIFICATE OF SERVICE</u>

The undersigned Assistant United States Attorney hereby certifies that in accordance with FED.R. CRIM. P.49, FED.R. CIV. P.5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following documents:

<u>GOVERNMENT'S RESPONSE TO MOTION TO VACATE SENTENCE</u>

were served pursuant to the district court's ECF system as to ECF filers, if any, and were sent by first-class mail on December 14, 2006, to the following non-ECF filer:

Martin A. Blumenthal
1 Northfield Plaza
Suite 300
Northfield, Illinois 60093

By:     s/Brian P. Netols
        BRIAN P. NETOLS
        Assistant United States Attorney
        219 South Dearborn Street
        Chicago, Illinois 60604
        (312) 353-4128